Spain, J.
Appeal from an order of the Supreme Court (Mulvey, J.), entered September 19, 2007 in Tompkins County, which, among other things, granted plaintiffs’ cross motion for partial summary judgment and directed the delivery of escrowed funds to plaintiffs.
This dispute involves a June 2005 purchase and sale contract for residential real property located on Cayuga Lake, which property lies partially in the Town of Covert, Seneca County, and partially in the Town of Ulysses, Tompkins County. Plaintiffs (hereinafter the sellers) agreed to sell the property for $720,000 and defendants (hereinafter the purchasers) tendered a deposit of $25,000. Prior to closing, the purchasers canceled the contract based on the existence of certain title encumbrances that were not disclosed to them prior to entering into the contract and demanded the return of their deposit. The sellers *1031 refused and instead commenced this action in August 2005 alleging that the purchasers’ refusal to close constituted an anticipatory breach of the contract. The purchasers counterclaimed, asserting fraud in the inducement, conversion, unjust enrichment, negligent misrepresentation and money had and received, and requested punitive damages.
In April 2007, following discovery, the purchasers moved for summary judgment and the sellers cross-moved for summary judgment on the issue of liability.[1] Supreme Court denied the purchasers’ motion, granted the sellers’ cross motion, and issued an order and judgment awarding the sellers the $25¡000 security deposit, along with approximately $4,800 in interest; it left any remaining damages to the sellers to be determined in subsequent proceedings. The purchasers appeal.
Some history of the property prior to the execution of the contract is required to understand the nature of the parties’ dispute. The property is improved by a house and a detached garage and is situated on a slope, with access to the lakefront available by means of a series of stairways. After the garage was constructed in 2001, neighbors complained that it encroached upon their right-of-way over the sellers’ property to reach their own properties. Thereafter, the sellers entered into extensive negotiations with their neighbors and the State of New York, which owned contiguous land, that culminated in the Watermark Easement Agreement.[2] Pursuant to this agreement, previously existing easements over all of the neighbors’ properties were defined, the sellers conveyed a permanent easement over their property for ingress and egress to the lakefront and all signatories agreed to share the cost of maintaining the various easements. Also pursuant to that agreement, the sellers agreed to maintain the landscaping in the area of their garage.[3] Although the Watermark Easement Agreement was executed approximately one year prior to this contract of sale, the agree *1032 ment was not recorded until July 2005, after the contract was executed; nor was the agreement provided to the purchasers prior to that time.
In addition, the former owner of the sellers’ property apparently constructed a drain pipe that illegally discharged water onto the parcel directly to the southeast of the sellers’ property. In 2004, the owner of that affected parcel, Rice Heritage Memorial, Inc., commenced an action against the sellers, the former owners of the sellers’ parcel and other neighboring property owners. The parties were thereafter able to negotiate a settlement to mitigate the drainage problems (hereinafter the Rice settlement). The Rice settlement included obligations on behalf of the sellers to install and maintain a drainage system that would divert water being discharged onto the Rice land and discharge it, instead, into the lake from the sellers’ land, to stabilize a “slump” in the land near the lakefront and, thereafter, to install a retaining wall to provide further stability to that area.[4] Included in the Rice settlement was an exchange of land, pursuant to which Rice deeded to the sellers an approximately seven-foot piece of lakefront property onto which the drainage system would drain, as well as an area of land contiguous to the slump to assist the sellers’ remediation efforts. The parcel of lakefront property received from Rice was burdened with a restriction against development.
In her deposition testimony, one of the purchasers—defendant Karen Meador—alleges that, while visiting the property in May 2005 and contemplating making an offer, she noticed the drainage pipe and mentioned to the sellers’ real estate agent that it was unattractive and she might want to remove it, to which the sellers’ real estate agent said nothing, despite the express obligations concerning the pipe contained in the Rice settlement. Further, at the same time, Meador allegedly inquired about the Rice land exchange—which was evident from a 2004 survey of the property—and sellers’ real estate agent told her that the purpose of the exchange was simply to straighten the boundary line and made no mention of the litigation between the sellers and Rice and the resulting encumbrances on the property. Indeed, none of the encumbrances or obligations associated with the Rice settlement was disclosed to the purchasers prior to the contract date.
Meador alleges that, during the same visit to the property, she made specific inquiries about the boundary line near the *1033 propane tank and was advised by one of the sellers’ real estate agents that the sellers’ property included land up to a fence behind the tank, which would have meant that the tank was wholly on the sellers’ property. In fact, the propane tank partially encroaches upon the neighbor’s property, and apparently cannot be moved within the boundary lines of the sellers’ property and still maintain the necessary distance from the house to meet code. In addition, it is alleged that the sellers’ realtor represented that a wall constructed of railroad ties was entirely on the property when, in fact, a portion of it extended onto a neighbor’s land. Meador admitted that the sellers’ agent did explain that there was a common area used for recreation and parking adjacent to the property—the area delineated in a document called the Watermark Partnership Agreement—but the agent did not provide the agreement or specific details. Meador left New York for her home in Texas without making an offer. She requested that the sellers’ agent send her an up-to-date survey as well as any documentation related to boundary lines, common areas and homeowners’ association bylaws or agreements. Thereafter, the sellers sent her a brief document summarizing the use of the common area,[5] as well as a summary, authored by the sellers, describing permissive boundary encroachments related to the property. Specifically, the document describes two verbal agreements with neighbors that are unrelated to the issues underlying this dispute. Thereafter, the purchasers contracted with the sellers to purchase the property.
On June 23, 2005, the sellers’ attorney, Mark May, sent a letter to the purchasers’ attorney, Jon Albanese, informing him of the obligations flowing from the Watermark Partnership Agreement (giving more particular information about the common area owned by the Watermark Neighbors Association), the Watermark Easement Agreement and the Rice settlement, and inquiring about whether they raised any concerns on the part of the purchasers. Apparently, Albanese never shared the contents of that letter with his clients, the purchasers, nor did he respond to May.
On July 20, 2005, Meador returned to New York in anticipation of closing and met the real estate agent and the sellers at the property to perform a final walk-through inspection. At the walk-through, Meador was presented for the first time with an updated survey, dated July 2005, which illustrated the fact that *1034 both the propane tank and certain landscape structures encroached on neighbors’ property. Meador thereafter contacted Albanese, who informed her for the first time of the June 23, 2005 letter from May, disclosing the additional encumbrances on the property. Meador contacted her mortgage company to make it aware of the title issues and was allegedly informed that, in light of the encumbrances, the mortgage financing would no longer be available.
Albanese then wrote to May on July 21, 2005, requesting mutual withdrawal from the contract and a return of the deposit. May wrote back the next day, denying the request, seeking a detailed list of title problems and stating that the sellers were willing to cure such in a timely fashion. Thereafter, on July 28, 2005, Albanese wrote May, again requesting that “the parties agree that the contract is dissolved.” Included with the Albanese letter was a letter from Meador, with a partial list of the defects in title to which the purchasers excepted, including the landscaping and propane tank encroachments and the provisions in the undisclosed Rice settlement, such as the restrictions on the lakefront footage and the agreement to maintain the drainage system. May responded by asserting that the propane tank had been moved, that the restrictive covenant was of no importance because zoning restrictions would foreclose building in any event and that maintenance of the drainage system was not an issue because property owners have no right to cause water to drain on their neighbors’ property. The sellers then commenced this action on August 17, 2005. On September 6, 2005, after both parties obtained litigation counsel, the sellers—through counsel—informed the purchasers that the issue with the waterfront restriction had been resolved and requested a list of alleged defects for cure within 30 days. The purchasers responded on September 9, 2005, rejecting the sellers’ offer to cure.
Initially, the purchasers assert that the purchase agreement was voidable upon execution because the sellers made material misrepresentations that influenced the purchasers in their decision to agree to purchase the property. Traditionally, there is “no duty upon a vendor to disclose any information concerning the property in an arm’s length real estate transaction” (Bethka v Jensen, 250 AD2d 887, 887-888 [1998]; see Boyle v McGlynn, 28 AD3d 994, 995 [2006]). However, if “ ‘some conduct (i.e., more than mere silence) on the part of the seller rises to the level of active concealment, a seller may have a duty to disclose information concerning the property’ ” (Boyle v McGlynn, 28 AD3d at 995, quoting Gizzi v Hall, 300 AD2d 879, 881 [2002] *1035 [some internal quotation marks omitted]), and a failure to make that disclosure can amount to an affirmative misrepresentation (see Cetnar v Kinowski, 263 AD2d 842, 844 [1999], lv dismissed 94 NY2d 872 [2000]; Striker v Graham Pest Control Co., 179 AD2d 984, 985 [1992], lv dismissed 79 NY2d 1040 [1992]; Young v Keith, 112 AD2d 625, 627 [1985]). A false representation in a disclosure statement has been held to constitute active concealment (see Simone v Homecheck Real Estate Servs., Inc., 42 AD3d 518, 520-521 [2007]; see also Rector v Calamus Group, Inc., 17 AD3d 960, 961 [2005]).
On this record, we hold as a matter of law that the sellers failed to disclose certain information that was within their exclusive knowledge and, on the facts of this case, such nondisclosure amounted to an affirmative misrepresentation (see Junius Constr. Corp. v Cohen, 257 NY 393, 399-400 [1931]; Cetnar v Kinowski, 263 AD2d at 844). Specifically, the representations made by the sellers on the property disclosure statement and by their real estate agent amount to active concealment. On the disclosure statement, the sellers answered “no” to the question that asked whether “anybody other than yourself [has] a lease, easement or any other right to use or occupy any part of your property other than those stated in documents available in the public record,” and it is undisputed that many of the alleged defects, including those incorporated in the Rice settlement and the Watermark Easement Agreement, were not part of the public record when the purchase contract was signed. The sellers also marked “no” to the question whether there were “any features of the property shared in common with adjoining land owners or a homeowners association,” despite the fact that the Watermark Easement Agreement called for shared maintenance costs for snowplowing and care of the right-of-way. One of the sellers, plaintiff Stuart Anderson, also admitted that the sellers’ realtor misled the purchasers with regard to the location of the property’s boundary lines. Finally, by providing some documentation disclosing boundary issues with neighbors in response to Meador’s request for any such documentation, the sellers became bound also to provide the Watermark Easement Agreement, the Rice settlement and other documents pertaining to such issues. Indeed, the partial disclosure of information pertaining to encroachments “was a tacit representation that the land to be conveyed was subject to no others, and certainly subject to no others materially affecting *1036 the value of the purchase” (Junius Constr. Corp. v Cohen, 257 NY at 400).[6]
Having concluded, as a matter of law, that misrepresentations were made, we nevertheless find that unresolved factual issues exist as to whether those misrepresentations were so essential to the bargain that they rendered the contract voidable upon execution (see Junius Constr. Corp. v Cohen, 257 NY at 399-400; Mix v Neff, 99 AD2d 180, 183 [1984]; Albany Motor Inn & Rest. v Watkins, 85 AD2d 797, 798 [1981], lv denied 56 NY2d 508 [1982]; see also Rosenschein v McNally, 17 AD2d 834, 834 [1962]). Meador stated unequivocally that, had she known about the title defects, she would not have executed the purchase contract. More significantly, the sellers themselves testified that the waterfront restriction issue was “significantly important” for a buyer to know and they admitted that information about the encumbrances would also be important to a potential buyer’s decision about whether to purchase the property and how much to pay.
On the other hand, the sellers assert that the landscaping encroachment on the neighbors’ property was not an encroachment at all but, rather, that the neighbors chose to continue the same landscaping on their own property, that the propane tank encroachment is not a title issue as the tank is owned by the fuel company, that the restriction on the waterfront is of no moment because of existing zoning restrictions, and that the agreement to maintain the drainage system imposed no additional liability on the owner of the sellers’ land inasmuch as a property owner has a responsibility to prevent drainage from flowing on to a neighbor’s property. Accordingly, questions of fact exist as to the extent to which the sellers’ misrepresentations of title defects were material, and whether the alleged misrepresentations induced the purchasers to execute the sale contract (see Gizzi v Hall, 300 AD2d at 881-882; Seneca Wire & Mfg. Co. v Leach & Co., 247 NY 1, 7 [1928]; Boyle v McGlynn, 28 AD3d at *1037 995; Bethka v Jensen, 250 AD2d at 887-888; Rudolph v Turecek, 240 AD2d 935, 938 [1997], lv denied 90 NY2d 811 [1997]; Striker v Graham Pest Control Co., 179 AD2d at 985; Dygert v Leonard, 138 AD2d 793, 795 [1988]).
Further, even if the sellers’ misrepresentations are found not to render the contract voidable, it remains undisputed that title encumbrances exist to which the sale was not made subject. Under such circumstances, Supreme Court correctly acknowledged that the purchasers could not be compelled to accept title subject to those encumbrances. However, the court also concluded that because the contract did not designate time to be of the essence, the purchasers remained obligated to tender performance and give the sellers a reasonable opportunity to cure the defects (see Ilemar Corp. v Krochmal, 44 NY2d 702, 703-704 [1978]; Klaiber, LLC v Coon, 48 AD3d 856, 857 [2008]). Indeed, this contract included a clause that provided that “[i]f defects are found in the title as shown by abstract, a written statement of objections shall be furnished, and [s]eller shall have a reasonable time, not exceeding thirty (30) days, to make said title marketable.”
A purchaser’s requirement to tender performance can be excused, however, if the title defect is not curable (see Ilemar Corp. v Krochmal, 44 NY2d at 703-704; R.C.P.S. Assoc. v Karam Devs., 258 AD2d 510, 511 [1999]). Further, where a seller is aware of a title defect yet makes no effort to cure it within a reasonable time, the purchaser’s tender of performance may not be necessary (see Klaiber, LLC v Coon, 48 AD3d at 857; Gentile v Sang Y. Kim, 101 AD2d 939, 939 [1984]). Here, issues of fact abound as to whether the purchasers were obligated to tender performance under these circumstances. The contract clause requiring a purchaser to object to title defects speaks to those defects found by a purchaser’s attorney upon examination of the abstract of title. It is arguable that the parties did not intend that clause to cover title issues not of public record and within the exclusive knowledge of the sellers. Moreover, even if the clause applies, evidence was proffered to demonstrate both that the sellers had no intention of curing the defects prior to closing and that the defects may not have been curable within the 30 days allotted by the contract. When the purchasers first learned of the various claimed defects in title, the sellers did not offer to cure, but argued that the concerns expressed by the sellers were nonissues. Further, aside from allegedly reaching a solution with Rice regarding the waterfront restriction after this action was commenced, it appears that the sellers took no other action with respect to any of the other encumbrances on the property. *1038 Although they professed, at one point, that the propane tank issue had been resolved, the record suggests that the existing propane tank was still encroaching on the neighbors’ property. In addition, the work to repair the slump and build the retaining wall was not commenced until September 2005 and not completed until November 2005. Thus, questions of fact exist as to whether the defects were curable within a reasonable time and, if so, whether the sellers had already squandered their reasonable time to cure the defects prior to the purchasers’ refusal to close (see Gentile v Sang Y. Kim, 101 AD2d at 940; cf. Willard v Mercer, 58 NY2d 840 [1983]).
In addition, even if the purchasers were required to tender performance under the facts of this case, the correspondence between the parties following the July 20, 2005 walk-through creates numerous other questions of fact, including whether the purchasers’ July 28, 2005 letter complied with the contract provision requiring a written statement of objections to any title issues, triggering the sellers’ obligation to cure within a reasonable time not to exceed 30 days, and whether the sellers’ letter of August 12, 2005 evinced an intent not to cure any of the defects complained of by the purchasers (see generally Bethka v Jensen, 250 AD2d at 888; Dygert v Leonard, 138 AD2d at 795).
The purchasers have also raised an issue of fact in asserting that they lost their financing when the title defects were disclosed to their lender and, consequently, their performance was excused due to failure of the mortgage contingency. When a mortgage commitment letter is revoked by the lender after the contingency period, in contrast to the failure to obtain a commitment letter in the first instance, the contractual provision relating to failure to obtain an initial commitment is inoperable, and the question becomes whether the revocation was attributable to any bad faith on the part of the purchaser (see Kapur v Stiefel, 264 AD2d 602, 603 [1999]; Creighton v Milbauer, 191 AD2d 162, 164-165 [1993]). Here, Meador stated that she informed the mortgage company of the defects immediately after she was apprised of them on July 20, 2005, and it was her impression that the mortgage was not going to proceed, although she did not recall when the company actually canceled its commitment. The letter of cancellation itself was not dated until August 12, 2005. Additionally, Meador admitted that she told the lender that she felt she was no longer obligated to close. Thus, a question of fact exists as to whether the mortgage revocation was procured by the purchasers in bad faith (see D’Agnese v Spinelli, 290 AD2d 528, 528 [2002]; Creighton v Milbauer, 191 AD2d at 166).
*1039 Finally, we reject the sellers’ argument that the purchasers’ counterclaim for fraud must be dismissed. Having concluded that the contract may be voidable due to a material misrepresentation, a fraud cause of action necessarily exists as long as there is evidence that could support a finding of scienter (see Pentony v Saxe, 2 AD3d 1076, 1077 [2003]; Cetnar v Kinowski, 263 AD2d at 843-844; Rudolph v Turecek, 240 AD2d at 938; Cohen v Colistra, 233 AD2d 542, 542-543 [1996]). Inasmuch as the intent to deceive can be inferred from the failure to disclose material facts that one is obligated to disclose (see Mella v Riina, 204 AD2d 955, 957 [1994], lv dismissed 85 NY2d 857 [1995]; Young v Keith, 112 AD2d at 626-627; Striker v Graham Pest Control Co., 179 AD2d at 985), we hold that the purchasers have stated a cause of action for fraud in the inducement.
Cardona, EJ., Rose, Malone Jr. and Stein, JJ., concur. Ordered that the order is modified, on the law, without costs, by reversing so much thereof as granted plaintiffs’ cross motion and directed the delivery of escrowed funds to plaintiffs, and, as so modified, affirmed.

. The purchasers first moved for summary judgment in April 2006 and were unsuccessful. In that same month, the sellers entered into a purchase contract—apparently after full disclosure of the issues underlying this litigation—to sell the property to a third party for $625,000. The parties closed in May 2006. In July 2006, the sellers amended their complaint to indicate the subsequent sale of the property.

. This is to be distinguished from the Watermark Partnership Agreement, executed at the same time and discussed infra, pursuant to which the sellers conveyed a portion of their land to a neighborhood partnership for the purpose of establishing a common parking and recreation area.

. It appears, however, that the garage may still be within the existing right-of-way, but the right-of-way was expanded to allow passage around the garage.

. Although the drainage system was installed in the fall of 2004, apparently the other improvements were not completed until the fall of 2005, following the events leading up to this dispute.

. While the sellers provided a summary of the arrangement that they apparently authored, they did not— despite Meador’s alleged request for any formal bylaws or agreements—provide the Watermark Partnership Agreement that set forth the terms governing the common area.

. The purchasers also allege that the sellers misrepresented the extent of repairs made to correct a structural defect to the foundation under an addition to the house. As no evidence was introduced that any defect existed at the time the contract was executed, we find that any such misrepresentation is immaterial. The purchasers also argue that the contract itself contained a misrepresentation in that it contained a space to include additional liens and encumbrances on the property that was left blank, despite the sellers’ admitted knowledge of other encumbrances. The identified space, however, is clearly intended to set forth those liens and encumbrances on the property to which the sale is expressly made subject. If, however, the defects could have been cured prior to closing such that the sellers could have kept their promise to provide clear title, the contract did not necessarily contain any misrepresentation.